UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

SOUTH GAS, INC. *et al*,

                                        Plaintiffs,

          v.

EXXONMOBIL OIL CORPORATION,

                                        Defendant.

No. 09–cv–6236
(KM)(MAH)


OPINION


**KEVIN MCNULTY, U.S.D.J.:**

Approximately ninety-six gas stations brought the original complaint in this action against ExxonMobil Oil Corporation ("Exxon"), in 2009. In the interim, this case was twice reassigned, most recently to me. Exxon previously moved before Judge Chesler to dismiss an earlier version of the complaint, and this, the Second Amended Complaint ("2AC", ECF No. 105), represents plaintiffs' response to those earlier rulings. Now before the court is Exxon's motion to dismiss (ECF No. 107) eight out of the ten counts alleged by the plaintiffs in the 2AC. (The two counts not challenged are those that survived motion practice before Judge Chesler. (7/29/10 Tr. 26–27 (ECF Nos. 32, 107–7))) Approximately 53 of the original 96 plaintiffs remain in the action.

For the reasons set forth below, defendant Exxon's motion to dismiss the complaint is denied.

## I.   BACKGROUND[1]

### A. The Parties

The plaintiffs are all Exxon branded retail gas stations located in New Jersey. All of them are franchisees of Exxon. (2AC ¶¶ 1–2, 13)

Defendant Exxon is a New York corporation with its principal place of business in Texas. (2AC ¶ 4) Exxon is a wholesaler that delivers gas and other related products across state lines to stations such as the plaintiffs'. (2AC ¶ 8)

### B. Relevant Facts

Exxon uses a franchise distribution method in New Jersey, under which it leases retail gas stations to franchisees who are required to purchase all of their gas from Exxon for resale to consumers. (2AC ¶ 10) Agreements between Exxon and the plaintiffs include the franchise agreement, Company Owned Dealer Operated Lease Provisions to the PMPA Franchise Agreement ("Lease"), and the Maintenance and Information Services Agreement for Electronic Point of Sale Terminal and Related Equipment ("MIS Agreement") (together the "Agreements").[2] (2AC ¶ 13) The Agreements are form agreements prepared by Exxon and executed without significant negotiation of terms. (2AC ¶ 14)

Article 17.1(b) of the franchise agreement grants the franchisee "responsibility for and control over the management and means of the day-to-day operations of the [b]usiness, including [p]roduct delivered," *inter alia.* (2AC

---

[1] The facts that follow are taken from the complaint. They are assumed to be true solely for the purposes of the motions to dismiss.

[2] Exxon attached examples of the relevant agreements to its motion. (*See* ECF Nos. 107–3, 107–4, 107–5) In deciding a motion to dismiss, the court can consider documents integral to or explicitly relied upon in the pleadings. *See Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2003) ("[D]ocuments whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered."); *In re Burlington Coat Factory Sec. Lit.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("what is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited").

¶ 26) Plaintiffs allege, however, that Exxon exercised control in a number of ways. For one, Exxon manipulated delivery load times to benefit from price fluctuations. (2AC ¶¶ 27–32) Prior to drops in price Exxon delivered gas to franchisees, increasing their inventory whether they needed it or not. (2AC ¶ 33; *see* ¶¶ 34–86 (detailing examples specific to particular plaintiffs)) Plaintiffs objected to this inventory practice through meetings between Exxon and Exxon-appointed New Jersey gas station representatives. (2AC ¶¶ 89–90) The complaint also alleges that Exxon exerted control by requiring plaintiffs to purchase and sell volumes of gas that were above the historical averages of gas sold at those stations. (2AC ¶ 733; *see* ¶¶ 734–97 (detailing examples specific to particular plaintiffs))

The complaint points to a number of provisions of the Agreements that demonstrate Exxon's control over their businesses (*see* 2AC ¶ 893):

- Article 2 of the franchise agreement required franchisees to purchase only Exxon gas according to a specified purchase schedule and required purchases be not less than 70% of the specified monthly and yearly quantities. (2AC ¶¶ 21–22)
- Article 2.2 of the franchise agreement set the price that franchises must pay Exxon for the gas at the time that the vehicle is loaded but provided Exxon the right to change the price "at any time and without notice." (2AC ¶ 24)
- Article 12.7 of the franchise agreement allowed for Exxon to assign its responsibilities to franchisees regardless of the impact on the franchisee and waived any franchisee claims for constructive termination or damages. (2AC ¶ 18)
- Article 3.6(C) of the MIS Agreement required point of sale equipment to be approved by Exxon. (2AC ¶ 847)

Plaintiffs also point to practices and provisions that allowed Exxon to restrict plaintiffs' ability to set their own retail prices. True, Article 9.20 granted franchisees the power to determine their own retail prices. (2AC ¶¶ 27, 93)

3

However, Exxon used a number of practices to frustrate this power, including the aforementioned manipulation of delivery times based on price fluctuations. (2AC ¶ 27) For example, Exxon calculated a "Weighted Average Margin" ("WAM"), which is a profit margin per gallon based on competitor's retail prices, to limit plaintiffs' profit margins. (2AC ¶ 94) Exxon limited their margins by increasing the wholesale price that it charged to plaintiffs if plaintiffs' profit margins were in excess of the determined WAM. (2AC ¶ 95) Exxon specifically raised its wholesale prices whenever plaintiffs attempted to increase retail profit margins and required plaintiffs to lower their retail prices prior to lowering its wholesale price. (2AC ¶ 96; *see* ¶¶ 97–216 (detailing examples specific to plaintiffs)) Exxon's actions effectively removed plaintiffs' ability to set their own retail prices. (2AC ¶ 217) Plaintiffs objected to these pricing practices through meetings between Exxon appointed New Jersey gas station representatives and Exxon. (2AC ¶ 218; *see* ¶¶ 89–90) Further affecting prices, Exxon provided rent waivers to favored franchisees competing with plaintiffs, lowering those favored franchisees' operating costs and enabling them to lower their retail prices. (2AC ¶ 299; *see* ¶¶ 300–08 (detailing specific waivers granted to gas stations in competition with specific plaintiffs))

Plaintiffs also allege that Exxon overcharged them for gas. Article 2.5 of the franchise agreement required franchisees to only pay for the gas that is delivered to them. (2AC ¶ 221) However, Exxon routinely charged plaintiffs for more fuel than they received. (2AC ¶ 222; *see* ¶¶ 223–95 (detailing examples specific to plaintiffs)) Exxon's representatives admitted the discrepancies and told plaintiffs that they should bear the loss as a "cost of doing business." (2AC ¶ 298)

Exxon's pricing and gas delivery manipulations, as well as its selective use of rent waivers, allegedly injured competition and favored plaintiffs' competitors. (2AC ¶ 309) In that vein, Exxon divided New Jersey into approximately 100 zones and charged stations different wholesale prices for gas depending on their zone placement. (2AC ¶¶ 497–98, 506–08; *see* Exs. B–C

4

(ECF No. 105–4)) Exxon charged disparate prices among the different zones—so much so that the wholesale prices in some zones exceeded the retail prices in others. (2AC ¶¶ 498–99) Exxon used this zone pricing scheme to favor certain stations and disfavor the plaintiffs. (2AC ¶¶ 500–02) Stations in geographical proximity, but in separate zones, paid different prices for gas, and certain of plaintiffs' competitors received advantageous wholesale prices. (2AC ¶¶ 503–05; Ex. A (chart comparing disparity in retail prices between plaintiffs and competitor stations) (ECF No. 105–4))[3] When charged higher wholesale prices, plaintiffs were forced to charge higher retail prices to cover their operating expenses. (2AC ¶ 509; *see* ¶¶ 510–716 (detailing examples specific to particular plaintiffs))

Plaintiffs also complain about Exxon's rent calculations. Article 2.1 of the Lease required plaintiffs who lease stations from Exxon to pay rent to Exxon as specified by a rent schedule and determined in accordance with Exxon's National Rent Guidelines ("Guidelines"). (2AC ¶ 311) Rents were calculated by "multiplying the property value by 12% and adding the real property tax charge." (2AC ¶ 316) The property values were determined by appraisal. (*Id.*) Although real estate values fell during the recession, upon information and belief, renewed leases did not reflect that reduction in value, and in some cases increased. (2AC ¶ 314) Plaintiffs were not provided with specific information as to the method of appraisal or the results of the appraisals. (2AC ¶ 318) Plaintiffs allege that Exxon deviated from the Lease when determining rents and instead considered profitability and discriminated in favor of certain dealers. (2AC ¶¶ 319–474; *see* ¶¶ 323–295 (detailing examples of favored dealer rent payments compared to plaintiffs' rent payments)) Plaintiffs objected to these rent calculations, as well as the rent waivers, through meetings between

---

[3] Plaintiffs also allege upon information and belief that to the extent any competitors listed in Exhibit A purchased their gas from third party distributors (known as "jobbers" in the industry), those jobbers received an unfair discount from Exxon even after accounting for the jobbers' freight costs. (2AC ¶¶724–28)

Exxon-appointed New Jersey gas station representatives and Exxon. (2AC ¶ 475; *see* ¶¶ 89–90)

Further, when Exxon decided to change its policy and pass on 100% of real estate taxes to the stations, it promised to offset rent so that the total payment would not increase. (2AC ¶¶ 481–84) Exxon charged plaintiffs 100% of the real estate taxes, but also increased the rent. (2AC ¶ 485) When Exxon obtained real estate tax relief, it did not pass on these savings to plaintiffs. (2AC ¶¶ 478, 485)

Plaintiffs also allege misrepresentations regarding Exxon's future as a franchisor in New Jersey. Between April 2007 and May 2008, plaintiffs received repeated assurances from Exxon that it would not sell its agreements with plaintiffs. (2AC ¶¶ 896–99) As a result of these assurances, Plaintiffs made substantial investments in and improvements to their gas stations in order to promote Exxon's trademark and foster its goodwill. (2AC ¶¶ 16, 900) However, in June 2008, Exxon notified its New Jersey dealers that it intended to assign all of its franchise agreements with New Jersey stations based on a plan that had been developing for eighteen months. (2AC ¶¶ 901, 903) In May 2009, Exxon did sell a station to a favored dealer, while refusing to engage in similar transactions with various plaintiffs. (2AC ¶ 902) Plaintiffs allege that these plans to divest have and will continue to diminish the value of their stations and their goodwill. (2AC ¶ 910)

Additionally, plaintiffs contend that Exxon treated them unfairly with regard to technology. For example, Article 3.6(A) of the MIS Agreement stated that Exxon would pay for telephone or satellite lines connecting equipment to Exxon's systems. (2AC ¶ 800) However, Exxon required plaintiffs to pay the fees for their satellite lines. (*Id.*; *see* ¶¶ 801–44 (detailing examples specific to plaintiffs)) Exxon also withheld approval of point of sale equipment and charged plaintiffs higher credit card fees than plaintiffs would be charged by third party services. (2AC ¶ 847; *see* ¶¶ 850–84 (detailing examples specific to plaintiffs)) Plaintiffs make similar allegations regarding the equipment required in the On-The-Run Franchise Agreement (a related business). (2AC ¶¶ 487–95)

6

Further, Exxon forced plaintiffs to purchase thousands of dollars of equipment in relation to their "Speedpass" program, which they then terminated and refused to refund plaintiffs for their expenditures. (2AC ¶ 888)

Plaintiffs also allege that Exxon retaliated against one of them, SAP Management, Inc. ("SAP"), after learning that SAP led the dealers in organizing and filing this suit. (2AC ¶ 913) Exxon decreased wholesale prices and other fixed costs of a favored dealer that competed with SAP to the point that the favored dealer could charge its retail customers less than the wholesale price that Exxon charged SAP, which also increased. (2AC ¶ 914) As a result, after September 2008, SAP's monthly sales dropped by nearly 200,000 gallons per month, which was almost a 50% decline. (2AC ¶ 915) SAP objected to this conduct in meetings with Exxon as early as November 2008. (*Id.*)

### C. Claims

Plaintiffs' complaint alleges ten claims for relief against Exxon:

1. Count one is a claim for relief under the Robinson-Patman Act, codified at 15 U.S.C. § 13, for allegedly manipulating the wholesale gas market by charging disparate prices to competing wholesale customers. (2AC ¶¶ 918–30)

2. Count two is a claim for relief under the New Jersey Franchise Practices Act ("NJFPA"), N.J.S.A. §§ 56:10-1 et seq, for allegedly imposing unreasonable standards of performance with the intention of driving the plaintiffs out of business. (2AC ¶¶ 931–50)

3. Count three is a claim of breach of the Agreements. Specifically, plaintiffs allege breaches of the franchise agreement's clauses that state that the dealers are in control of their day-to-day operations and can set their own retail prices. It is also a claim for relief for alleged breach of the rent guidelines under the Lease and alleged breach of Exxon's obligation to pay technology fees under the MIS Agreement. (2AC ¶¶ 951–61)

4.   Count four is a claim for relief for violation under the Uniform
     Commercial Code, which requires good faith in setting prices. (2AC
     ¶¶ 962–68)[4]

5.   Count five is a claim for relief for a breach of the duties of good faith and
     fair dealing. (2AC ¶¶ 969–74)

6.   Count six is a claim for fraudulent inducement based on Exxon's alleged
     representations to plaintiffs regarding its future in New Jersey and
     offsetting the rents. (2AC ¶¶ 975–83)

7.   Count seven is a claim for negligent misrepresentation based on Exxon's
     alleged representations to plaintiffs regarding its future in New Jersey
     and offsetting the rents. (2AC ¶¶ 984–87)

8.   Count eight is a claim for relief under the New Jersey Unfair Motor Fuels
     Practices Act, N.J.S.A. 56:6-17, et seq, for allegedly manipulating the
     wholesale motor fuel market by charging different prices to competing
     wholesale customers. (2AC ¶¶ 988–94)

9.   Count nine is a claim for reformation or declaratory judgment to resolve
     alleged inconsistencies in the Agreements. (2AC ¶¶ 995–1008)

10.  Count ten is a claim for tortious interference with prospective economic
     advantage based on Exxon's alleged retaliation and intent to cause harm
     to the business of SAP. (2AC ¶¶ 1009–12)

**D. This Motion to Dismiss**

Exxon's motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6)
argues that: (1) plaintiffs do not properly allege the price discrimination claims,
the NJFPA claim, the fraud and negligent misrepresentation claims, the
reformation claim, and the tortious interference claim; (2) the price
discrimination claims cannot be based on rent waivers or differences in pricing

———————————————

[4] Counts four and five are not at issue. Judge Chesler previously ruled that they
were pleaded sufficiently. (7/29/10 Tr. 26–27)

between retail dealers and wholesale distributors; (3) the breach of contract claim fails because statutory notice was not provided or because the contract was not breached; and (4) plaintiffs fraud and negligent misrepresentation claims are time-barred or barred by an integration clause or other language in the contract.

## II.   ANALYSIS

### A. Standard of Review

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trs. Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014). The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011).

Fed. R. Civ. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964–65 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 555, 570; *see also W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility...." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965–66). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* But a complaint is properly dismissed when it does not support its legal conclusions with well-pleaded factual allegations. *Id.* at 679, 129 S. Ct. at 1950. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## B. Price Discrimination

The Robinson-Patman Act ("RPA") amended the Clayton Act, 15 U.S.C. § 13, to prohibit price discrimination that threatened to lessen competition. *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 142 (3d Cir. 1998). Section 2(a) of the RPA provides in relevant part that:

> It shall be unlawful for any person engaged in commerce ... to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

15 U.S.C. § 13(a).

Plaintiffs allege a secondary-line claim under the RPA. (*See* 5/31/11 Tr. 8 (ECF Nos. 97, 107–8)) "Secondary-line cases ... involve price discrimination that injures competition among the discriminating seller's customers...." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176, 126 S. Ct. 860, 870 (2006). To prove a secondary-line injury plaintiffs "must show (1) that sales were made to two different purchasers in interstate commerce; (2) that the product sold was of the same grade and quality; (3) that defendant discriminated in price as between the two purchasers; and (4) that the discrimination had a prohibited effect on competition." *Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 212 (3d Cir. 2007). For the fourth prong the Supreme Court has recognized "that a permissible inference of competitive

injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time." *Volvo Trucks*, 546 U.S. at 177, 126 S. Ct. at 870. Thus, to obtain a rebuttable presumption of competitive injury plaintiffs will only need to prove that they competed with favored dealers to sell gas, and that Exxon charged those dealers lower prices over an extended time. *See Feesers*, 498 F.3d at 213.

Upon a motion to dismiss, though, plaintiffs do not yet need to prove anything. Rather, plaintiffs only must plead facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965. For their claim to survive, plaintiffs' facts must create a "reasonable expectation that discovery will reveal evidence" of Exxon's alleged price discrimination. *Id.* at 556, 127 S. Ct. at 1965. As Judge Chesler pointed out upon ruling on a previous iteration of the complaint, those facts must be properly alleged for each of the remaining plaintiffs as this case was not filed as a class action. (5/31/11 Tr. 9–10)

In those earlier rulings, Judge Chesler adopted the pleading requirements set forth in *Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626 (S.D. Tex. 1999), in which seventy-three gas stations made similar claims under the RPA. *Chawla* required each of the plaintiffs to allege the following:

> (i) the name and location of the source of the particular Plaintiff's [] gasoline and, if known, the name and location of the source of gasoline acquired by the competing jobber, jobber-station, or company-owned station.
>
> (ii) the type of Robinson–Patman Act violation that is alleged (*i.e.*, primary, secondary, or tertiary, and whether there is a contention that Defendants use a functional discount as a subterfuge vis à vis the particular Plaintiff).
>
> (iii) the identity and location of the particular jobber(s) and/or other retail station(s) that received an allegedly unlawful favorable price, the approximate price that jobber received (if known), and the approximate time period of the allegedly unlawful favorable treatment,
>
> (iv) the geographic area in which the specific Plaintiff competes with each jobber or other station in issue as to that Plaintiff,

11

> (v) what or how competition has or may have been injured as a
> result of the price discrimination suffered by that Plaintiff....

75 F. Supp. 2d at 654. I adopt and continue to apply the *Chawla* approach. I
find that plaintiffs have alleged sufficiently specific facts for each plaintiff to
comply with its Rule 8(a) obligations and survive a motion to dismiss as to this
RPA claim.

Plaintiffs state their station locations and the names and locations of
alleged "favored" competitors for each plaintiff station; the alleged retail price
disparity between a plaintiff station and its competitors; and the alleged
duration of that disparity. (2AC Ex. A) Also specified is the geographic area in
which each plaintiff competes. (2AC ¶¶ 510–716) Plaintiffs attach to their
complaint some factual support for their allegation that Exxon allocates pricing
using gerrymandered zoning maps. (2AC Ex. B; *see* ¶¶497–509)

Exxon argues that plaintiffs have not satisfied *Chawla* for two reasons.
Exxon first contends that plaintiffs failed to "allege specific, sustained
disparities between [] prices they have paid and the prices paid by their alleged
'favored' competitors." (Def. Br. 12 (ECF No. 107–2)) Second, Exxon disputes
that plaintiffs have properly alleged competitive injury. (Def. Br. 14)

To support its first argument Exxon points out that plaintiffs' price
disparity allegations only state that "favored" competitors' retail prices
consistently were lower than plaintiffs' retail prices. (Def. Br. 13) Such an
allegation, says Exxon, is consistent with a number of explanations; a dealer's
chosen retail price reflects many factors aside from the wholesale price. (*Id.*)

In a vacuum Exxon might be correct, but plaintiffs allege many other
facts which, when viewed together, sufficiently raise a plausible inference of
price discrimination. Plaintiffs allege that Exxon controlled their profit margin
using the WAM calculation, raising wholesale prices if plaintiffs raised retail
prices or reduced other costs to increase their margins, and forced plaintiffs to
lower their retail prices before Exxon would lower the wholesale prices. (*See*
2AC ¶¶ 94–218) They also allege that Exxon controlled other costs that would
be factored into retail prices, such as rent and technology costs. (2AC ¶¶ 311–

475; 800–88) Exxon also controls how much gas their dealers must buy and can set the wholesale prices at their whim. (2AC ¶¶ 24–90) Plaintiffs cite examples of Exxon's gerrymandered zone pricing scheme. (2AC Ex. B) With Exxon exerting this level of control over its dealers, a showing of extended disparities in retail prices among dealers makes an inference of price discrimination more reasonable.

Exxon's second argument fails for essentially the same reasons. Exxon argues that plaintiffs fail to allege competitive injury because they fail "to allege that sales ***actually have been diverted away*** from any specific plaintiff to any specific 'favored' competitor." (Def. Br. 15) This misstates plaintiff's burden to prove competitive injury, which is to show "evidence that a favored competitor received a significant price reduction over a substantial period of time." *Volvo Trucks*, 546 U.S. at 177, 126 S. Ct. at 870. And upon a motion to dismiss, plaintiffs only need to establish a reasonable inference of competitive injury. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. As detailed above, plaintiffs have fulfilled their obligations to plead specific information as to each plaintiff and its alleged competitors, and the further specificity desired by Exxon is not required at the pleading stage. *See Satnam Distribs. LLC v. Commonwealth-Altadis, Inc.,* No. CIV 14–6660, 2015 WL 5971583, at *5 (E.D. Pa. Oct. 14, 2015) (collecting cases).[5] Once again, Exxon offers alternative scenarios, but there is enough here to permit the case to go forward on plaintiffs' proffered scenario.

Exxon lumps plaintiffs' allegations in count eight under the New Jersey Unfair Practices Act, N.J.S.A. 56:6-17, et seq, together with their Robinson Patman Act claims in count one. Exxon provides no unique argument and cites no case law to support dismissing count eight. For all that has been placed

_____

[5] Claims about rent waivers and price discrimination between plaintiffs and jobbers also require factual development.

13

before me, they are coextensive. I therefore deny Exxon's motion to dismiss on count eight, as well as count one.

### C. New Jersey Franchise Practices Act

The NJFPA, N.J.S.A. §§ 56:10-1 et seq, "attempted to remedy the effects of unequal bargaining power by prohibiting the inclusion in the contract of provisions that would relieve franchisors of liability under the Act or would unfairly prejudice the franchisee in the operation of its franchise. *Kubis & Perszyk Assocs., Inc. v. Sun Microsystems, Inc.*, 680 A.2d 618, 628 (N.J. 1996) (citing N.J.S.A. 56:10-7). "Under New Jersey law, remedial statutes must be construed broadly to give effect to their legislative purpose." *Liberty Lincoln-Mercury v. Ford Motor Co.*, 134 F.3d 557, 566 (3d Cir. 1998)

Plaintiffs specifically allege that Exxon infringed N.J.S.A. § 56:10–7(e), which makes it a violation of the NJFPA "[t]o impose unreasonable standards of performance upon a franchisee." (2AC ¶¶ 931–50) The statute does not define "unreasonable standards of performance," *King v. GNC Franchising, Inc.*, No. CIV 04–5125 (SRC), 2006 WL 3019551, at *4 (D.N.J. Oct. 23, 2006), and the New Jersey courts have not given much guidance. At oral argument on previous versions of this complaint, Judge Chesler appeared disinclined to accommodate plaintiffs and extend the statute beyond his holding in *King*, upon a summary judgment motion, that "arbitrariness, bad intent or economic ruin ... appear to be the hallmarks of an 'unreasonable standard of performance' under the NJFPA." 2006 WL 3019551, at *5.

Cases from this district have found violations of § 56:10–7(e) in such obvious cases. *See e.g., Beilowitz v. Gen. Motors Corp.*, 233 F. Supp. 2d 631, 643–44 (D.N.J. 2002) (requiring a loss of eleven million dollars or forty percent of sales). On the other hand, the district court cases have recognized that not all improper conduct of franchisors, including violations of other parts of the NJFPA, are necessarily violations of § 56:10–7(e). *See e.g., Liberty Lincoln-Mercury Inc. v. Ford Motor Co.*, No. CIV 02–4146 (WGB), 2006 WL 1098178, at *5 (D.N.J. Mar. 31, 2006) *rev'd in part*, 676 F.3d 318 (3d Cir. 2012) (a

14

surcharge for compliance with the NJFPA). I see that many of the cases were decided based upon reviewing evidence in aggregate and deciding whether compliance with the standards of performance was unreasonable. *See e.g.*, *Dunkin' Donuts Inc. v. Dough Boy Mgmt., Inc.*, No. CIV 02–243 (JLL), 2006 WL 20521, at *11 (D.N.J. Jan. 3, 2006) ("Defendants provide a litany of examples as to how Plaintiffs set them up for failure...."); *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F. Supp. 637, 653 (D.N.J. 1980) ("While any given action of [franchisor] may not have violated this statutory prohibition the cumulative effect amounted to imposing an unreasonable standard of performance...."); *Cent. Jersey Freightliner, Inc. v. Freightliner Corp.*, 987 F. Supp. 289, 295-96 (D.N.J. 1997) (requiring stores stay open twenty four hours a day, seven days a week, as well as specific inventory levels, sales quotas, and financing was not sufficient for a preliminary injunction).

A factual context is required. Such a claim is ill-suited for resolution on a motion to dismiss. *See Naik v. 7-Eleven, Inc.*, No. CIV 13–4578 (RMB), 2014 WL 3844792, at *14 (D.N.J. Aug. 5, 2014. Nevertheless, of course, the minimum level of specificity must be present.

During oral argument on a previous version of this complaint Judge Chesler dismissed the NJFPA claim because the allegations lacked specificity, and he expressed skepticism that the alleged infractions involved "standards" under the plain meaning of the NJFPA. (5/31/11 Tr. 18–29) Plaintiffs' current pleadings have adequately addressed Judge Chesler's concerns. The 2AC lists at least two items that satisfy a fairly strict reading of the "standards of performance" section: inventory standards (2AC ¶ 33; *see* ¶¶ 34–86(detailing examples specific to particular plaintiffs)) and volume requirements (2AC ¶ 733; *see* ¶¶ 734–97 (detailing examples specific to particular plaintiffs)). And it alleges that they were unreasonable. Additionally, plaintiffs proffer a list of other complaints that could contribute to a finding of a § 56:10–7(e) violation, including price discrimination. *See Gelardi*, 502 F. Supp. at 653 ("While any given action of [franchisor] may not have violated this statutory prohibition the

cumulative effect amounted to imposing an unreasonable standard of performance....")

Again, I do not remotely suggest that such a claim is proven. I hold only that the allegations are sufficient to permit the claim to go forward as to whether Exxon is imposing unreasonable standards of performance.

Exxon argues that plaintiffs are required to allege that Exxon terminated stations to plead a successful claim under the NJFPA. (Def. Br. 20) Exxon's only support for this is a reading—a misreading, I believe—of Judge Chesler's comments at oral argument. (*See* 7/29/10 Tr. at 19; 5/31/11 Tr. at 20:6-12.) Exxon cites no case law for this proposition, and the statute does not explicitly require termination. Nor would requiring termination be faithful to the policy of reading the NJFPA broadly to effect its legislative purpose. *See Liberty Lincoln-Mercury*, 134 F.3d at 566.

Accordingly, I deny Exxon's motion to dismiss the NJFPA claim.

### D. Breach of Contract

Under New Jersey law,[6] the elements of a breach of contract are that (1) the parties entered into a valid contract; (2) the defendant failed to perform its contractual obligation; and (3) the plaintiff sustained damages as a result. *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013) (citing *Coyle v. Englander's,* 199 N.J. Super. 212 (N.J. Super. Ct. App. Div. 1985)); *Peck v. Donovan*, 565 F. App'x 66, 69–70 (3d Cir. 2012) (citing *Murphy v. Implicito,* 392 N.J. Super. 245 (N.J. Super. Ct. App. Div. 2007)).

Exxon argues that plaintiffs have failed to establish the second element: that Exxon did not perform its contractual obligations. (Def. Br. 25–27) The

---

[6] Both parties assume that New Jersey law governs the contracts at issue, and I likewise will assume its applicability.

complaint alleges, however, that Exxon breached five clauses of the Agreements:

1. Article 17.1(b) of the franchise agreement granted the franchisee "responsibility for and control over the management and means of the day-to-day operations of the [b]usiness, including [p]roduct delivered." Plaintiffs claim it was violated because Exxon exerted control over the business in numerous ways, including setting the rent, wholesale gas prices, and hours of operation; charging for connection to satellite systems and excessive credit card fees; and dictating product deliveries and inventory levels. (2AC ¶¶ 953–54)

2. Article 9.20 of the franchise agreement granted franchisees the power to determine their own retail prices. Plaintiffs claim it was violated by the WAM and zone pricing systems. (2AC ¶ 956)

3. Article 2.5 of the franchise agreement required franchisees to pay for the gas that is delivered to them. Plaintiffs claim it was violated when Exxon charged plaintiffs for more fuel than they received. (2AC ¶¶ 221–95)

4. Article 2.1 of the Lease required plaintiffs who lease stations from Exxon to pay rent to Exxon as specified by the rent schedule and determined in accordance with the Guidelines. Plaintiffs claim it was violated when rent was not related to the total property value or real estate value as mandated by the Guidelines. (2AC ¶¶ 311, 957–58)

5. Article 3.6 of the MIS Agreement required Exxon to pay for telephone or satellite lines connecting equipment to Exxon's systems. Plaintiffs claim it was violated because Exxon has required plaintiffs to pay the fees for their satellite lines. (2AC ¶¶ 800, 960)

Exxon, on the other hand, points to different contractual provisions, which give it the power to take the actions that are portrayed by plaintiffs as contractual breaches. (Def. Br. 8–11, 25–27)

Those conflicting positions cannot be resolved on a motion to dismiss. "Ordinarily the construction of a written agreement is a matter for the court, but where its meaning is uncertain or ambiguous and depends upon parole

evidence admitted in aid of interpretation, the meaning of the doubtful provisions is a question of fact." *Anthony L. Petters Diner, Inc. v. Stellakis*, 202 N.J. Super. 11, 27-28, 493 A.2d 1261, 1270 (N.J. Super. Ct. App. Div. 1985) (citing *Michaels v. Brookchester, Inc.,* 140 A.2d 199 (N.J. 1958)); *accord Klein v. Budget Rent a Car Sys., Inc.*, No. CIV 12–7300 JLL, 2013 WL 1760557, at *6 (D.N.J. Apr. 24, 2013).

Exxon also states that the 2AC does not properly allege that Exxon dictated prices. (Def. Br. 26) But plaintiffs explicitly allege that Exxon "require[d] Plaintiffs to lower their retail price prior to any wholesale price decrease." (2AC ¶ 96; *see* ¶¶ 97–216 (detailing examples specific to plaintiffs)). For present purposes, that is enough.

Certain claims are said to trigger the notice requirement of the New Jersey Uniform Commercial Code ("UCC"), N.J.S.A. § 12A:2-607(3)(a). Plaintiffs allege, however, that their Exxon-appointed representatives gave notice for these claims.[7] (*See, e.g.*, 2AC ¶¶ 89–90, 218, 296–98, 475). That is not proof of notice, but it is a sufficient allegation of notice.

As to the breach of contract claims, then, the motion to dismiss is denied.

**E. Tort Claims**

Plaintiffs allege state law claims of common law fraud and negligent misrepresentation. "Fraud in New Jersey requires '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" *United States v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 448 (3d Cir. 2005)

---

[7] Comment 4 to the UCC emphasizes a lenient notice requirement. "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." N.J.S.A. § 12A:2-607 Comment 4.

(quoting *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (N.J. 2005)); *accord Williams v. BASF Catalysts LLC*, 765 F.3d 306, 317 (3d Cir. 2014), *reh'g denied* (Dec. 1, 2014). And "[u]nder New Jersey common law, persons who negligently misrepresent material facts may be held liable to those who, as a result of their justifiable reliance on such misrepresentation, suffer economic harm." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 289 (3d Cir. 1992) (citing *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 142–43 (N.J. 1983) ("An incorrect statement negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance.")).[8]

Plaintiffs allege two misrepresentations: (1) Exxon repeatedly stated that it would not be leaving New Jersey (2AC ¶¶ 896–99) and (2) Exxon, when it decided to charge the plaintiffs for real estate taxes, stated that it would offset rent so that the plaintiffs' total payments would not increase. (2AC ¶¶ 481–84) Plaintiffs allege that Exxon knew these representations were false and intended for plaintiffs to rely on them. (*See* 2AC ¶¶ 483, 897, 903) Plaintiffs also allege that they reasonably relied on those statements and suffered damages, in that they were lulled into continuing to invest in promoting Exxon's goodwill and trademark, the value of which is now diminished. (2AC ¶ 904–10)

Again, Exxon strongly denies these allegations, but these denials are matters of fact, to be addressed in connection with summary judgment. I find that these tort claims are adequately alleged and deny Exxon's motion to dismiss plaintiffs' common law fraud and negligent misrepresentation claims.[9]

---

[8] "Because negligent misrepresentation does not require scienter as an element, it is easier to prove than fraud." *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1196 (N.J. 2000)

[9] Exxon also argues that the claims related to its plans to leave New Jersey, first revealed in June 2008 (2AC ¶¶ 976–977), fall outside of a contractual one year limitations period set forth in the contract (See 2AC Ex. A § 20.6) (The complaint was filed in December 2009 (ECF No. 1).) Plaintiffs contend that the limitation is unconscionable and thus unenforceable. (Pl. Br. 50–53) Such a limitation must be reasonable and not violate public policy: "the claimant [must] have sufficient opportunity to investigate and file an action, [] the time [must] not be so short as to

## F. Reformation

Plaintiffs allege that their contract is one of adhesion and that it is unconscionable, and they ask the Court to apply the equitable remedy of reformation. (2AC 995–1008) "The traditional grounds justifying reformation of an instrument are either mutual mistake or unilateral mistake by one party and fraud or unconscionable conduct by the other." *St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden*, 443 A.2d 1052, 1055 (N.J. 1982). Whether parties are mistaken or a party's conduct is unconscionable "are essentially factual" questions. *Id*. The necessary facts will emerge in discovery on the merits. Thus I deny Exxon's motion to dismiss the reformation claim.[10]

## G. Tortious Interference with Prospective Economic Advantage

To prove a claim for tortious interference with prospective economic advantage a "plaintiff must show that it had a reasonable expectation of economic advantage that was lost as a direct result of defendants' malicious interference, and that it suffered losses thereby." *Lamorte Burns & Co. v. Walters*, 770 A.2d 1158, 1170 (N.J. 2001). Malice "is determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented." *Id*.

---

work a practical abrogation of the right of action, and [] the action [must] not be barred before the loss or damage can be ascertained." *Eagle Fire Prot. Corp. v. First Indem. of Am. Ins. Co.*, 678 A.2d 699, 704 (N.J. 1996). It is true that the Supreme Court of New Jersey "has routinely upheld" one year contractual limitations provisions, *id*. at 706 (appeal from trial verdict), and plaintiffs may have a steep hill to climb here, but the issue is a fact-intensive one. At any rate, allegations that are not time-barred remain within these counts, and the partial dismissal sought by Exxon would not alter the scope of discovery appreciably. Accordingly, I will not dismiss piecemeal allegations on limitations grounds.

[10] The declaratory judgment request is part of the same count and asks for the same relief including rewriting the contract. (2AC ¶ 1006) The reformation claim is the proper vehicle.

Plaintiffs' complaint has specific allegations on behalf of one dealer, SAP, that Exxon inflicted harm on its business after SAP organized the dealers. (2AC ¶¶ 913–15) Whether these allegations suffice to prove tortious interference with economic advantage is a factual question, *see Lamorte Burns*, 770 A.2d at 1170. At least as to SAP, it is adequately alleged, so I will deny Exxon's motion to dismiss this claim.

## III.   CONCLUSION

For the reasons set forth above, Exxon's motion to dismiss is **DENIED**.


Dated: February 29, 2016

Hon. Kevin McNulty
United States District Judge